Filed 9/22/22  P. v. Muhammad CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ASAD MUHAMMAD,<br><br>    Defendant and Appellant. | A161877<br><br>(Solano County<br>Super. Ct. No. VC142576) |

Asad Muhammad appeals from the denial of his petition for resentencing pursuant to Penal Code section 1170.95.[1]  Appellant was convicted of three counts of first degree murder with special circumstances based on his participation in an armed robbery during which three people were killed.  The trial court found appellant ineligible for relief under section 1170.95 as to two of the murder counts because the jury had found

---

[1]    All further statutory references are to the Penal Code.

    Section 1170.95 was recently renumbered to section 1172.6 without substantive change while this appeal was pending.  (Stats. 2022, ch. 58, § 10; see *People v. Strong* (2022) 13 Cal.5th 698, 708, fn. 2.)  Since section 1170.95 was the correct statutory designation at the time of the underlying proceedings and since the parties and the trial court below referred to that statute, we will continue to refer to section 1170.95 as well.  Where appropriate, however, we will also refer to section 1172.6 in supplementing citations to section 1170.95.

true lying-in-wait special circumstances, which required a finding that appellant had the intent to kill. With regard to the remaining murder count, the court issued an order to show cause, but ultimately found appellant ineligible for relief because he was a major participant in the underlying robbery and acted with reckless indifference to human life.

On appeal, appellant argues the trial court erroneously concluded he was ineligible for relief for the two murder counts based on the jury's true findings on the lying-in-wait special circumstances. With regard to the remaining count, he contends substantial evidence did not support the court's conclusion that he acted with reckless indifference to human life. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Underlying Crimes and Procedural History

We begin with an overview of the crimes and the proceedings leading to appellant's sentence. For efficiency's sake, we borrow facts and procedural history recited in our earlier appellate opinion affirming the judgment. (*People v. Muhammad* (May 27, 2004, A096633) [nonpub. opn.] (*Muhammad I*).)[2]

---

[2]     Effective January 1, 2022, and before being renumbered, section 1170.95 was amended so as to preclude a trial court from relying on facts recited in an appellate opinion when ruling on a petition under section 1170.95. (Former § 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2.) Although the amendment allows a court to "consider evidence previously admitted at any prior hearing or trial that is admissible under current law," it restricts the court's consideration to "the *procedural history* of the case recited in any prior appellate opinion." (Former § 1170.95, subd. (d)(3), italics added, now § 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*).) Appellant does not argue—and there is no indication in the record—that the trial court in this case relied on the prior appellate opinion in reaching its decision. Our own analysis of the issues on appeal is based on our review of the record including the trial transcripts, not the summary of facts in our prior appellate opinion. But

Alphonso Lontayo, Martin McCumber, and Dennis Jacobson were employees of the Loomis Armored Car Company who were killed inside the company's Vallejo facility during an armed robbery in 1991. (*Muhammad I*, *supra*, pp. *1–*2.) The prosecution theorized that appellant, along with Thomas Young, Eugene Livingston and Victor McClain, committed the crimes. (*Id.* at p. *1.) Young and Livingston were separately convicted of robbery and conspiracy to commit robbery and, while Livingston was acquitted of murder, Young was convicted of three counts of murder with special circumstances. (*Id.* at pp. *1–*2, *10.)

As relevant here, the People charged appellant with three counts of murder (§ 187, subd. (a)), plus the special circumstances that the murders occurred while appellant was engaged in the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17), hereafter referred to as the felony-murder special circumstance), that appellant intentionally killed the victims while lying in wait (§ 190.2, subd. (a)(15), hereafter referred to as the lying-in-wait special circumstance), and the multiple murder special circumstance (§ 190.2, subd. (a)(3)). The People further alleged as to each of the murder counts that appellant personally used a firearm (former

---

solely for the purpose of efficiently summarizing the background of this case, we will set out the background facts as recited in our prior opinion. In doing so, we note appellant does not dispute that *Muhammad I* accurately recites the trial evidence. Indeed, appellant himself incorporates nearly the entire "Facts and Procedural History" section of that opinion into his own opening brief. Appellant also requested that we take judicial notice of the prior opinion, which we granted.

That being said, pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions" which was adopted after we issued our prior opinion, we will refer to some of the witnesses by their first names and last initials or by their initials only.

§ 12022.5, subd. (a)(1)) and that a principal was armed with a firearm
(§ 12022, subd. (a)).

The following is a summary of the trial evidence, which we borrow from *Muhammad I*, *supra* (all headings and some footnotes omitted). (See *ante*, fn. 2.)

"On the night of November 13, 1991, Loomis employees Richard [W.] and his partner Dennis [H.] returned to the main facility from their day's route. Because of delays, they were the last crew to arrive, following the truck of Alphonso Lontayo and Martin McCumber.

"Returning drivers typically approached the sliding gate in the Loomis security fence and honked for entry. The turret operator, Dennis Jacobson, then opened the gate from inside the building. Jacobson was the only employee inside at night. Normally, [Richard W.] and [Dennis H.] would drive to bay number three and wait for Jacobson to open the large steel door. The Lontayo-McCumber truck used bay number one.

"About 8:55 p.m., [Dennis H.] drove to the gate and honked, but nothing happened. [Richard W.] became concerned and noticed that the bay one door was partially open. He got out of the truck and heard the alarm blaring. Looking into the yard, [Richard W.] saw Jacobson lying face down inside the bay and the back door of the Lontayo-McCumber truck open. [Richard W.] rushed back to [Dennis H.] shouting, 'Dennis we're hit. Let's get the hell out of here.' They drove to a nearby pay phone and called the police.

"The alarm had been activated at 8:49 p.m. Responding officers arrived about 9:00 p.m. and entered the Loomis building through the partially open bay door. Jacobson's body was found just north of the door, next to the vault. He lay face down in a pool of blood with one hand bound behind his back with duct tape. Lontayo and McCumber were at the rear of the bay, also lying face

4

down with their hands duct-taped behind their backs. Lontayo was dead; McCumber would die later. Each victim had been shot once in the back of the head. . . .

"Investigation of the crime spanned several years as police sought to connect physical evidence to specific perpetrators. Criminalist James Streeter recovered a Loomis-issued .38 caliber revolver on the floor near Jacobson's body. It had been fired three times and appeared to have been the murder weapon. The revolver belonged to a Loomis driver and was normally stored overnight in an unlocked cabinet in the facility. The sound of the gunshot that killed Jacobson apparently triggered a sensing device, which activated the alarm. A .357 magnum revolver was also found near Jacobson's body. The gun had been stolen from its owner and purchased by Thomas Young[] in 1989.

"A hole had been cut in the perimeter cyclone fence and bolt cutters were found nearby. Later, fingerprints on these bolt cutters were matched to Thomas Young. A Loomis truck driven by employee Eugene Livingston was parked on the street next to the hole, blocking the view of persons passing by. Jacobson could not have seen the hole from his position inside. On the day of the crime, Livingston completed his routes by 3:00 p.m. and could have parked his truck inside the facility gates.

"Loomis door keys were found near the bodies of McCumber and Lontayo. No employee keys were found to have been missing, but no notation on the keys prevented their duplication. All employees knew that various security cameras scanned the facility and fed to a video recorder (VCR) in the first floor office. The box containing the VCR had been pried open and the tape was missing.

"Several duffel bags containing millions of dollars in cash were found on the floor of bay number one. There was a roll of duct tape in one bag. Other bags contained camouflage clothing, shoes and a shoulder holster. Duffel bags were also found in the driveway and at the corner of Sonoma and Bennett streets, which bordered the Loomis facility. Both bags were filled with money. None of the bags belonged to the Loomis company.

"On Bennett Street, just beyond the hole in the fence, the officers found a black ski mask. Near the duffel bag on Sonoma Street, officers recovered a pair of brown gloves, a camouflage shirt and a turtleneck shirt. A single cloth glove was also found nearby.

"In the parking lot of the National Guard Armory, located across Bennett Street, police found a black ski mask with a portion of black pantyhose inside the mask. The feet of the stockings had been cut off and the legs were each tied into knots. A pair of black gloves was found next to the mask. A saliva stain found on the pantyhose was later tested for DNA. A 1998 DNA test proved critical to the identification of [appellant].

"The morning after the robbery, a large heavy bag was found less than two miles from the Loomis facility. Inside the bag were camouflage pants and a .357 caliber round. The round was the same brand of ammunition as that found in the gun recovered near Jacobson's body. A pair of L.A. Gear tennis shoes with one brown and one black shoelace was also in the bag. [U.J.], Thomas Young's former girlfriend, testified that he wore tennis shoes with one brown and one black shoe lace. Trace evidence on the shoes and sock included a skin flake, which was also later tested for DNA.

"Lake Dalwig sits on the southeast side of the Loomis facility. The lakebed was searched 16 days after the crimes. In the lakebed, about 300 feet from the Loomis facility, officers found an AK-47 assault weapon and a

6

camouflage jacket. Stuffed in the pocket were the feet portion of pantyhose and a pair of latex gloves. The pantyhose feet were consistent with the remainder of the pantyhose found in the ski mask. They were not unique enough to permit positive identification.

"Robert [Y.] was the registered owner of the AK-47. That gun and a shoulder holster found in one of the duffel bags were taken from his home in 1991. [Robert Y.]'s landlord testified that he thought the apartment had been abandoned. The landlord saw the shoulder holster in the apartment, but could not recall seeing the assault rifle. He gave a large fish tank to . . . [appellant]'s brother, who lived across the street from the apartment. [Appellant's brother] denied taking the AK-47 or shoulder holster.

"Charles [J.] worked with [appellant] as a janitor at Napa State Hospital. [Charles J.] also knew Victor McClain. [Appellant] and McClain came to [Charles J.]'s house in August or September 1991. During the visit [appellant] showed [Charles J.] an AK-47 that resembled the one found at Lake Dalwigk.

"On June 18, 1992, federal agents searched Thomas Young's residence at 420 Miller Street in Vallejo during an unrelated investigation. An address book recovered there listed the telephone numbers of [appellant], McLain and Livingston, who were referred to as Brothers James,[3] Victor and Eugene respectively. . . .

"In 1993, carpet samples were collected from [appellant]'s home at 146 Maher Court and from Thomas Young's residence. Criminalist Faye Springer compared the carpet samples to fibers from evidence recovered at the Loomis scene. She determined that fibers from [appellant]'s carpet were similar in

---

[3]   "[Appellant]'s name was James Brown before he adopted a Muslim name."

all physical and chemical characteristics to fibers found on the turtleneck sweater, two of the duffle bags, a pair of Honor shoes from one of the duffel bags, and the ski mask that had contained the panty hose. Carpet fibers from Young's residence were similar to fibers found on one of the duffel bags and on the L.A. Gear shoes and socks.

"Footprints taken from Thomas Young, [appellant] and Victor McClain were compared to the impressions in shoes found in the duffel bags. The Honor shoes were similar to McClain's sample and . . . Young was the 'best fit' for the L.A. Gear shoes.

"Hair samples from 19 subjects were examined and compared with hairs found on several items of evidence. Kent [A.] and two other men could not be excluded as sources of hairs found on the ski mask containing the pantyhose, but a conclusive identification was not possible. A sample of [appellant]'s hair did not match those in evidence. . . .

"Vallejo Police Lieutenant Ronald Becker interviewed [appellant] in October 1993. [Appellant] acknowledged that he was a friend of McClain, and knew both Livingston and Thomas Young. On one occasion [appellant] had been to the apartment shared by Thomas and [S.] Young. [Appellant] attended the Muslim Mosque in Vallejo and had been the secretary there. [Appellant] argued with another mosque member, [Kent A.], about [Kent A.]'s marijuana use. Thomas Young and [Kent A.] referred to [appellant] as 'the police.' . . .

"Eugene Livingston testified under a grant of use immunity. He had been convicted of robbery and conspiracy to commit robbery at the Loomis facility, but acquitted of murder. Livingston testified that his friend Victor McClain introduced him to [appellant]. Livingston had been a Loomis driver and knew that the last two trucks of the night carried millions of dollars.

8

Livingston had keys to the Loomis trap doors and was aware of the security cameras. At trial, Livingston denied any involvement in the Loomis crimes. He was impeached with a recanted confession he gave following his arrest in 1993.

"In his confession, Livingston told investigating officers that the robbery was [appellant]'s idea and that [appellant] 'called the shots.' About a month before the crimes, [appellant], Livingston, McClain and Thomas Young met once or twice to discuss the robbery. At two other meetings, [appellant] had an assault weapon and Young carried a large pistol. Livingston told the others about the video cameras and the VCR. Additionally, Lieutenant Becker, who was present during the confession, testified that Livingston said he gave his Loomis keys to [appellant], who duplicated them.

"Livingston testified that he had been drinking heavily the night before his arrest and had only slept an hour. He was arrested at 8:00 a.m. and interviewed at the FBI office for three hours. He was then allowed to sleep until about 6:30 p.m., when the interview continued for another three hours. Livingston was concerned about the death penalty because Detective Risk, one of the interviewing officers, talked about it often during breaks. Livingston decided to give a statement in exchange for a promise that the prosecution would not seek the death penalty. An agreement was reached with the prosecutor. However, Livingston continued to deny knowledge of the crimes. As a result, the deputy district attorney withdrew the agreement and left the room. Risk told Livingston he 'blew it' and had one last chance to speak. Livingston admitted he 'gave James the keys,' and went on to confess.

"Livingston testified that he lied to avoid the death penalty. He gave police information he learned from news reports, press conferences, a

9

television show, and conversations at Loomis. Moreover he gleaned much information from the interrogators' questions. Livingston said the investigators repeatedly gave him the names of 'James,' McClain and Young during the interview so he 'gave them back.' Risk asked many times about the keys found at the crime[] scene. Risk also told him that the tape had been removed from the Loomis VCR.

"Risk testified that neither he nor deputy sheriff Charles Knowles discussed the case with Livingston during breaks. Risk also testified that he never discussed the death penalty with Livingston, although Livingston raised the subject, saying that he did not want to be executed. He offered to tell the truth, and Risk agreed to talk to the deputy district attorney.

"Denise [B.] testified that she worked as a Loomis payroll clerk in 1991 and had an affair with Livingston. Several weeks before the crimes, Livingston told [Denise B.] that he was going to rob the business. He said he had been planning the robbery for a long time and would execute it with his 'brothers.' Livingston asked [Denise B.] where the VCR was located. A few days before the crimes, Livingston telephoned [Denise B.] and told her not to work late. He said that it could be dangerous and that the 'brothers didn't care.' When [Denise B.] asked if employees would be hurt, Livingston responded that they were 'white trash' and 'he didn't care about them.' [Denise B.] had not taken Livingston's statements seriously because he sometimes lied.

"Florin [M.] met Livingston in 1991. Livingston told her that he was planning a robbery and would get millions of dollars. Months later Livingston telephoned her and told her to watch 'Unsolved Mysteries' on television and to look for 'the thing that we talked about. . . .' Joanne [C.]

10

who was also present during the conversation recalled that Livingston said that he was going to rob an armored car truck. . . .

"As DNA technology improved, the saliva stain on the pantyhose was analyzed several times by the Department of Justice DNA laboratory. A 1993 PCR test eliminated all but eight percent of African-Americans as possible donors. Typing of [appellant]'s blood sample using DQ alpha showed that it matched the saliva sample. In 1996, the stain was examined using the more sophisticated polymarker test and [appellant]'s sample matched all seven loci. The probability of such a match was one in 840,000 African-Americans. Additionally, the criminalist tested the skin flake found on the L.A. Gear shoes and determined that it matched Thomas Young and one in 34,000 African-Americans. Finally, in September 1998, an eight probe RFLP test showed that the pantyhose sample matched [appellant] as one in 66 trillion African-Americans. . . .

"Loomis security films recorded in August and September 1991 revealed the front gate was left open for long periods. The bay doors were also left open on occasion, sometimes with the vault door open as well. Loomis employees testified that sometimes the turret room door was propped open.

"[Appellant] challenged the evidence collection techniques. Initially, the police did not include the National Guard Armory parking lot within the perimeter of the crime scene. [Appellant] was unable to determine who located the ski mask or maintained surveillance until criminalist Streeter arrived. Streeter handled items of evidence wearing his own cotton gloves rather than latex gloves. . . .

"Robin [W.]'s prior testimony was read. In 1991 she lived with her boyfriend Thomas Young along with Young's brother [S. Young] and his

11

girlfriend. [Robin W.] told police that on the night of the crimes, [Kent A.] picked up Thomas Young at 6:00 p.m. and dropped him home about four hours later. [S. Young] also left the house that night, but not with Thomas and [Kent A.].

"The prior testimony of . . . [the] minister of the People's Mosque in Vallejo was read. [The minister] had seen [appellant], Victor McClain and Eugene Livingston together at the mosque. He also saw Thomas Young, his brother [S. Young] and [Kent A.] there. At some point [appellant] and McClain transferred to a mosque in Richmond.

[¶] . . . [¶]

"[U.J.], Thomas Young's former girlfriend, testified that Young and [Kent A.] were always together and that [Kent A.] was Young's 'right hand man.' She described [Kent A.] as having light skin and blue eyes. [U.J.], the Young brothers and [Kent A.] all attended the same mosque.

"Nathaniel [Y.] testified that he was walking near the Loomis facility around 7 or 8:00 p.m. on the night of the crimes. As he approached the corner of 5th and Bennett Streets, bordering the facility, he saw a parked Bronco. An African-American man wearing dark army fatigues stood next to the car door. Two men sat inside and one of them appeared to be either a Caucasian or light-skinned black man. All three men looked like soldiers and wore fatigue caps. [Nathaniel Y.] also saw a dark duffel bag in the Bronco. He saw no guns. [Nathaniel Y.] asked the man outside the car for a cigarette and stood with him for several minutes. The man said the group was going on maneuvers, but made no further conversation. [Nathaniel Y.] was not aware that there was a National Guard Armory nearby. [Nathaniel Y.] testified that he left and returned 30 minutes later. Police were then in the area and detained him. The empty Bronco was still parked on the street.

12

[Nathaniel Y.] later viewed a physical lineup. He picked a man identified as Larry [W.] as the person who had given him the cigarette. [Nathaniel Y.] had been convicted of 11 felony convictions between 1960 and 1995, including burglary, robbery and possession of stolen property. At one point that night [Nathaniel Y.] saw a woman walking her dog.

"Susan [B.] testified that on the night *before* the crimes, she parked her car at the corner of 5th and Bennett Streets to walk her dogs. She saw two African-American men and a blonde Caucasian man wearing light beige camouflage outfits. They were talking to another man whom she identified as [Nathaniel Y.]. [Susan B.] saw no Bronco in the area. She also saw an African-American man in an army green jumpsuit standing near the armory entrance. . . .

"[Appellant] testified that he joined the Vallejo mosque in December 1990 and became secretary. One of his duties was to search those entering the mosque for weapons or drugs. [Appellant] left the mosque in January 1991 for various reasons, including conflicts with mosque members. He met the Young brothers and [Kent A.] through the mosque. [Kent A.] is a light-skinned African-American with blue eyes. [Appellant] once searched Thomas Young and found cocaine and marijuana in his pocket. The minister allowed Young to keep the drugs. [Appellant] learned that Young had labeled him a police agent. [Appellant] disagreed with the minister's preaching that white men are the devil. When [appellant] met with the minister to resign his membership, the minister ordered the Young brothers, [Kent A.] and McClain to escort him from the building. [Appellant] never visited the Young residence.

"[Appellant] and his wife sold homemade bean pies. In July 1991, while [appellant] was selling pies in Vallejo, the minister, the Young

13

brothers, [Kent A.], McClain, Livingston and others drove up in three cars. They wore suits and bow ties, which [appellant] described as Nation of Islam dress. Thomas Young and others approached [appellant], and Young told him that 'something bad' would happen if he continued selling pies. [Appellant] admitted that he had written his name and phone number on the paper found in Thomas Young's address book. [Appellant] routinely put his name and phone number in his pie boxes so that customers could contact him.

"[Appellant] met McClain at the mosque in December of 1990. [Appellant] coached McClain's daughter in little league, but McClain later withdrew her from the team. [Appellant] met Livingston at the mosque around the same time, but did not associate with him.

"[Appellant] testified that he did not participate in the Loomis crimes, but could not explain his saliva on the pantyhose mask. That day he had worked at his janitorial job on his regular 6:00 a.m. to 2:30 p.m. shift. He then went to his second job at a Richmond office. [Appellant] secured the contract to clean the office through his sister-in-law Yolanda [P.], who worked there. [Appellant] hired [Yolanda P.]'s husband Kenny to help on the contract, which ran from September to December 1991. [Appellant] testified that he never missed a night of work, including the night of the crimes. Each night [appellant] signed into the Richmond office at 5:30 p.m. While he cleaned, his supervisor Herman [S.] or one of the guards brought [appellant] a key. [Appellant] locked up when he finished and returned the key to the guardhouse. Some nights [Herman S.] was still there and locked up. [Appellant] usually left between 8:15 and 8:30 p.m.

"In April 1991 [appellant] went to Charles [J.]'s house to show him a bolt action 30.06 caliber rifle that [Charles J.] was interested in buying.

14

[Appellant] never took an AK-47 rifle to [Charles J.]'s home. In July 1991, [appellant] and [Charles J.] argued and he never returned to [Charles J.]'s house.

"[Appellant] showed an AR-15 assault rifle to John [L.] sometime before September 1991 and asked him to upgrade it. Between Christmas and New Year's, 1991, [appellant] traded an AK-47 with [John L.]. The gun had never been fired and was in its original box.

"[Appellant] acknowledged that in 1993 Lieutenant Becker asked him where he was on the night of the Loomis crimes. [Appellant] told Becker, 'I really don't know, I don't remember, but I would have been at home.' At trial, [appellant] testified that he was at work, not home. He said that he did not recall he had been working at the Richmond office until later, when he discussed Becker's interview with his wife.

"John [L.] was a Vallejo police officer in 1991 and met [appellant] through a friend. [John L.], a licensed firearms dealer, sold [appellant] a receiver for an AR-15 assault weapon in May or June 1991. In December 1991, [appellant] offered to trade an AK-47 for a handgun. Contrary to [appellant]'s testimony, the weapon [appellant] showed him was an AK-84S, not an AK-47. [Appellant] and [John L.] completed the trade.

"Herman [S.] worked at the Richmond office and supervised [appellant]'s janitorial services. [Herman S.] testified that [appellant] started cleaning at 5 or 5:30 p.m., after the building tenants left, and finished in three or four hours. [Herman S.] admitted telling an FBI Agent in 1994 that when [appellant] started cleaning at 5:30 p.m., he finished by 7:45 p.m. [Herman S.] normally worked from 11:30 a.m. to 8:00 p.m. and closed the building. On the night of the crimes, however, he worked from 7:00 a.m. to 3:30 p.m. and did not know if [appellant] was there.

15

"[Herman S.] was responsible for the sign-in sheets recording the arrival and departure of contract workers. In early 1994, a defense investigator sought to locate the sign-in sheets at the Richmond office for the period covering the crime date. After speaking with numerous people, he could not obtain the records. The investigator knew that FBI agents had already tried and failed to acquire the same records. Security guard Gloria [T.] did not recall any night in November 1991 when [appellant] failed to come to work.

"Kenneth [P.] is [appellant]'s brother-in-law. [Kenneth P.] testified that neither he nor [appellant] missed a night's work in November 1991. The cleaning job generally started at 5:30 p.m. and he was 'on [his] way home' by 7:30 or 7:40 p.m. It normally took [Kenneth P.] 15 minutes to drive from Richmond to Vallejo. Most nights [Kenneth P.] left first because [appellant] had to return the key to the guard across the street.

"Six character witnesses, including four co-workers from various jobs and two people who knew [appellant] as a little league coach, testified that he was non-violent and honest."

The jury was instructed on murder and felony-murder principles, including the definition of express malice and the principle that a person who unlawfully kills another human being with malice aforethought or during the commission or attempted commission of a robbery is guilty of murder. The jury was instructed that the following constitutes first degree murder: all murder perpetrated by willful, deliberate, and premeditated killing with express malice; the killing of a human being during the commission or attempted commission of a robbery; and a murder immediately preceded by lying in wait. The jury was also instructed on aiding and abetting principles, including that a defendant is guilty of murder if the crime of armed robbery

16

was committed, he aided and abetted that crime, a co-principal committed murder, and murder was a natural and probable consequence of the commission of the armed robbery. The court provided the jury additional instructions as to the special circumstance allegations.

The jury found appellant guilty of three counts of first degree murder. With regard to count 1, concerning victim Jacobson, the jury found true the felony-murder special circumstance allegation and the allegation that a principal was armed with a firearm, but found not true the lying-in-wait special circumstance allegation and the allegation that appellant personally used a firearm. As to counts 2 and 3, concerning victims Lontayo and McCumber respectively, the jury found true the felony-murder and the lying-in-wait special circumstances, and the allegation that a principal was armed with a firearm, but found not true the allegation that appellant personally used a firearm. The jury also found true the multiple murder special circumstance allegation.

In September 2001, the trial court sentenced appellant to three consecutive terms of life without the possibility of parole, plus a three-year consecutive determinate term for the arming enhancements. A different panel of this division affirmed the judgment in a nonpublished opinion. (*Muhammad I, supra,* at p. *1.)

**B.     Proceedings on the section 1170.95 petition**

In October 2019, the trial court received a form section 1170.95 petition from appellant. Appellant's petition checked boxes indicating that:  (1) a charging document was filed against appellant allowing the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) he was convicted of first or second degree murder under the felony-murder rule or natural and probable consequences

17

doctrine; and (3) he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189 effective January 1, 2019. Appellant also checked boxes indicating that he was convicted of first degree felony murder and that he could not now be convicted of that crime because he was not the actual killer, he did not aid and abet the murder with intent to kill, and he was not a major participant in the underlying felony who acted with reckless indifference to life.

The trial court appointed counsel for appellant who filed a new section 1170.95 petition. In June 2020, the court found appellant ineligible for resentencing as to counts 2 and 3—regarding the murders of Lontayo and McCumber—because the jury found true lying-in-wait special circumstances as to these counts, which required a finding that appellant had the intent to kill. The court indicated, however, that appellant stated a prima facie case for relief as to count 1—regarding the murder of Jacobson—and the court issued an order to show cause.[4] The parties filed briefing, and appellant sought reconsideration of the ineligibility finding as to counts 2 and 3. Appellant also requested that the court take judicial notice of the clerk's and reporter's transcripts from the 2001 trial, which the court granted. Neither party submitted any "new or additional evidence" at the hearing. (Former § 1170.95, subd. (d)(3), now § 1172.6, subd. (d)(3).)

Ultimately, the trial court declined to reconsider its ruling as to counts 2 and 3, and found appellant ineligible for relief as to count 1. Though noting that appellant was convicted on a felony-murder theory and that there was no proof that appellant himself actually committed the murders, the court

---

[4]    The trial court believed appellant stated a prima facie case even though the jury, in finding the felony-murder special circumstance true, necessarily found at least that appellant was a major participant in the robbery who acted with reckless indifference to human life.

18

concluded the evidence established, beyond a reasonable doubt, that appellant was a major participant who acted with reckless indifference to life. This appeal followed.

## DISCUSSION

### A. General Principles

In 2018, the Legislature enacted Senate Bill No. 1437 (Senate Bill 1437) which " 'amend[ed] the felony-murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 838–839, 842 (*Gentile*).)

First, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e): " 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' " (*Gentile, supra*, 10 Cal.5th at p. 842.)

Second, Senate Bill 1437 amended the natural and probable consequences doctrine by adding section 188, subdivision (a)(3) (section 188(a)(3)): " 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based

19

solely on his or her participation in a crime.' " (*Gentile, supra*, 10 Cal.5th at pp. 842–843.)

Beyond amending sections 188 and 189, "Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) Under the statute, "an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[; and] [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' " (*Lewis*, at pp. 959–960; see § 1172.6, subds. (a)(1)–(3) & (b)(1)(A).) "Where the petition complies with section 1170.95 subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief." (*Lewis*, at p. 960; § 1172.6, subd. (c).)

"[T]he prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own

20

documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971.)

"If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960; see § 1172.6, subds. (c), (d)(1) & (3).)

**B. Count 1**

With regard to count 1 involving victim Jacobson, appellant does not challenge the trial court's finding that he was a major participant in the robbery. Instead, appellant contends the evidence was insufficient to prove that he acted with reckless indifference to human life.

As a preliminary matter, we note the parties disagree on two points: (1) whether the jury's felony-murder special-circumstance finding rendered before *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) categorically precludes relief under section 1170.95; and (2) whether, based on *Banks* and *Clark*, a habeas corpus petition—not a section 1170.95 petition as appellant has filed here—is the proper procedural vehicle for challenging a special-circumstance finding.

While this appeal was pending, the California Supreme Court resolved the disagreement, holding that "[f]indings issued by a jury before *Banks* and *Clark* do not preclude a defendant from making out a prima facie case for relief under Senate Bill 1437," and that a petitioner need not utilize habeas corpus to set aside a special circumstance finding, but instead may proceed via a section 1172.6 petition. (*People v. Strong*, *supra*, 13 Cal.5th at pp. 703, 709–710, 712–713.)

Thus, we proceed to the merits. As we shall explain, the record here amply supports the trial court's conclusion, beyond a reasonable doubt, that appellant was a major participant who acted with reckless indifference to human life.

### 1. *Legal Standards*

As noted, a participant in the perpetration or attempted perpetration of a robbery in which a death occurs is liable for murder if the participant was: the actual killer; not the actual killer but, with intent to kill, aided and abetted the commission of first degree murder; or a "major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(1)–(3).) Section 190.2, subdivision (d)—which was intended to bring state law into conformity with *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*)—provides that "[i]n the case of first degree felony murder, 'every person, not the actual killer, who, with reckless indifference to human life and as a major participant' aids or abets the crime may be convicted of special circumstance murder. [Citation.] The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks*, *supra*, 61 Cal.4th at p. 798, quoting § 190.2, subd. (d).) In this regard, there is a significant

overlap between being a major participant and having reckless indifference to human life, such that the fact that a defendant was a major participant in a felony can " 'often provide significant support' " for a finding of reckless indifference. (*Clark*, *supra*, 63 Cal.4th at pp. 614–615.)

The reckless indifference element has both "a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

When analyzing whether a defendant acted with reckless indifference to life, courts must consider the totality of the circumstances. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The California Supreme Court has identified the following factors to consider when assessing the reckless indifference element: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Ibid.*) The court

23

has emphasized that " ' "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Ibid.*)

The California Supreme Court has also explained the mental aspect of culpability requires that courts look to whether a defendant has " ' " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " ' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra,* 61 Cal.4th at p. 801.) In other words, such defendants must " 'subjectively appreciate[] that their acts were likely to result in the taking of innocent life' [citation]." (*Id.* at p. 802.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; *only knowingly creating a 'grave risk of death' satisfies the constitutional minimum.*" (*Id.* at p. 808, italics added.)

"We review the trial judge's factfinding for substantial evidence."[5] (*Clements, supra,* 75 Cal.App.5th at p. 298; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747.) This means that " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Maciel* (2013) 57 Cal.4th 482,

---

[5] The People, at one point in their brief, seem to suggest that we should review the merits of this claim de novo. But the question here " 'remains a question of fact . . . [and] we see no reason to withhold the deference generally afforded to such factual findings.' " (*Clements, supra,* 75 Cal.App.5th at p. 302.) In any event, on this record, the outcome would be no different if we reviewed the decision independently.

24

514–515.) We presume " 'the existence of every fact the trier could reasonably deduce from the evidence.' " (*Id.* at p. 515.)

### 2. *Reckless Indifference to Human Life*

As indicated, appellant does not dispute that he was a major participant. Thus the question is whether substantial evidence supports the trial court's conclusion beyond a reasonable doubt that appellant acted with reckless indifference to human life. Mindful of the " 'significant[] overlap' " between being a major participant and having reckless indifference to human life (*Clark*, *supra*, 63 Cal.4th at p. 615), we proceed with our analysis.

Here, substantial evidence supports the trial court's conclusion that appellant was a major participant in the robbery. According to appellant's cohort Livingston, the robbery was appellant's idea; appellant "call[ed] the shots"; and appellant attended four meetings with himself, McClain, and Young to plan the robbery. At some of the meetings, appellant did most of the talking about the plan and brought along a "Uzi-type assault-type weapon" while Young brought a large revolver. Livingston—who at the time of the crimes was a Loomis employee—told the police that he gave appellant his keys to the Loomis facility and that appellant had them copied.

Other circumstantial evidence confirmed appellant's active participation in the robbery. For example, appellant's DNA matched DNA found on a saliva stain on pantyhose inside a black ski mask found directly across the street from the Loomis facility. Fibers found on multiple items at or near the crime scene—e.g., the turtleneck shirt, duffel bags, the shoulder holster, shoes, and the ski mask and pantyhose with appellant's saliva on it— were similar in all physical and chemical characteristics to fiber from appellant's home carpet. According to the trace evidence expert witness, the fibers found on the ski-mask containing the pantyhose with appellant's saliva

25

appeared typical of a primary transfer, i.e., a direct transfer of material from one object to another.

There was also substantial evidence that appellant acted with reckless indifference to human life. Livingston's statements to law enforcement provided evidence that the perpetrators had inside knowledge about Loomis that assisted in their planning of the armed robbery, including knowledge that only one turret operator would be working at night, that the shuttle trucks arriving at night would have two armed employees each and millions of dollars, and that a VCR recorded security camera footage.[6] Supplied with this knowledge, the perpetrators, including appellant, went to Loomis at night with weapons, gloves, masks, and camouflage clothing and entered the premises by cutting a hole in the fencing where the turret operator would not be able to see. They gained control of the turret operator (victim Jacobson), tying his left hand behind his back, but allowing his other hand to remain free to open the gate when the next Loomis truck arrived.

There was ample evidence of appellant's knowledge that the planned robbery would involve the use of firearms. In addition to Livingston's statement that appellant and Young brought an assault weapon and a large pistol to their planning meetings, appellant's co-worker testified the AK-47 found in Lake Dalwigk was the same gun appellant once showed him. Law enforcement found the AK-47 in the lake bed about 300 feet from the Loomis facility and about 200 feet from the ski mask that contained the pantyhose with the saliva stain. Roughly 118 feet from the AK-47, law enforcement found a camouflage shirt with a pocket containing pantyhose feet, which was

---

[6]     Livingston told the police that during planning meetings, he told appellant and the others about things at Loomis such as the vault alarm. The perpetrators also took the tape from the VCR that recorded the security cameras, which was kept in a closed unmarked cabinet in an office.

similar to and could not be excluded as being from the pantyhose with cut feet bearing appellant's saliva. A shoulder holster—which had been stolen along with the aforementioned AK-47 from an apartment across the street from where appellant's brother lived—was found inside one of the robbers' duffel bags left inside the Loomis facility. Both the AK-47 and the .357 magnum were found loaded with multiple live rounds, and the AK-47 had its safety off and contained a fully loaded magazine.[7] All this provided proof of appellant's knowledge that the planned robbery would involve a high likelihood of killing.

Also, there was testimony from Denise B., a woman who did accounting for Loomis and who had an intimate relationship with Livingston. Weeks before the crime, Livingston had told Denise B. that he was going to rob Loomis with "his brothers."[8] And days before the crime, Livingston warned Denise B.—who had recently been working late nights at Loomis—that it was best not to work late, that "it could be dangerous," and *the brothers didn't care*." (Italics added.)

The circumstance that all three victims were murdered in an execution-style manner—bound, made to lie face down on the ground, then shot in the

---

[7] While the jury found the personal use of firearm enhancements (former § 12022.5, subd. (a)(1)) alleged as to the murder counts not true, this presents no obstacle to a conclusion that appellant at least brought the gun to the scene primed for use, or that he allowed a confederate to take it, and knew guns would be used. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 398.) Appellant does not appear to contest the evidence showing he possessed the AK-47.

[8] There was evidence that members of the Vallejo mosque that Livingston, appellant, Young, and McClain all attended referred to each other as "brothers" followed by their first name. Appellant was in Young's address book as "Bro. James," and there were entries for "Brother Vic" and "Brother Eugene."

back of the head—also evidenced a high degree of forethought and knowledge that firearms would be used in a lethal manner. On this score, the fact that the victims were bound with duct tape does not logically support appellant's claim that the killings suggested a sudden or impulsive reaction to unexpected resistance by the victims and were not planned or anticipated.

Finally, there is no evidence that appellant did anything to obtain assistance for the victims after they were shot, though one of the victims was initially still alive when police arrived. Appellant argues that if he was not inside the Loomis facility, then "it is not clear that he had any opportunity to prevent the murders or aid the victims." Even crediting appellant's claim that he was across the street, it remains the case that he would have heard the gunshots and the alarm, which Loomis employee Richard W. testified was "very loud." Richard W. and co-worker Dennis H. testified they could hear the alarm from outside the facility upon opening the door to their armored vehicle. Thus, appellant was in the position to know or at least entertain a strong suspicion that a victim had been shot. Yet there is no evidence appellant did anything to confirm or deny such a suspicion. This is not a case where we can say appellant could not do anything to render assistance. (*In re Miller* (2017) 14 Cal.App.5th 960, 976.)

In sum, the totality of the circumstances supports the trial court's conclusion that appellant was subjectively aware of and willingly involved in the planning and violent execution of the armed robbery and that he was a major participant who consciously disregarded a foreseeable and significant risk of death. (*Scoggins, supra,* 9 Cal.5th at p. 677.) By plotting and undertaking this nefarious act, appellant knowingly created and ignored a grave risk of death and acted with reckless indifference to human life. (*Ibid.*)

Citing *Clark*, *supra*, 63 Cal.4th 522 and *Scoggins*, *supra*, 9 Cal.5th 667, appellant argues the fact that a defendant knows a gun will be used during a felony is not enough to establish reckless indifference to human life, and neither is planning a robbery. We have no quarrel with either of those propositions, but the evidence shows much more than mere knowledge that a gun would be used, and the robbery in this case bore no similarity to the robberies in *Clark* and *Scoggins*. The robbery here involved a carefully planned armed invasion of an armored car company's facility and the robbery of company employees known to carry firearms. The nature of this specific robbery entailed a grave risk of lethal force being used, in large part because of the certainty that victims would be present and armed. (*In re Taylor* (2019) 34 Cal.App.5th 543, 558 [indicating knowledge of a likelihood of resistance and the need to meet it with lethal force is a consideration in determining whether a defendant acted with deliberate indifference].) The circumstances here elevated the risk to human life significantly beyond the risks inherent in other armed robberies. (*In re Miller*, *supra*, 14 Cal.App.5th at p. 976.)

The circumstances here stand in stark contrast to those in *Clark* and *Scoggins*. In *Clark*, the defendant planned a robbery of a CompUSA where the victims were supposed to be handcuffed and kept out of the way. The one gun that was used was supposed to be unloaded and utilized to compel the victims into handcuffs, and the defendant was not in the immediate area when his cohort shot the victim. (*Clark*, *supra*, 63 Cal.4th at pp. 612–614.) The court in *Clark* found there was no reckless indifference, in part because the one gun was loaded with only one bullet. (*Id.* at pp. 619, 621–623.) In *Scoggins*, the defendant planned to have others commit an *unarmed* assault and robbery of a man who swindled him. The defendant there waited at a

29

nearby gas station during the incident, checked on the victim after the shooting, and remained at the crime scene where he was interviewed by police who described him as cooperative.  (*Scoggins*, *supra*, 9 Cal.5th at pp. 671–672.)  The *Scoggins* court found no reckless indifference as there was no evidence that the planned robbery and assault would involve the use of weapons.  (*Id.* at pp. 671, 682.)  The facts of *Clark* and *Scoggins* are plainly distinguishable from those in the instant case.

Appellant argues the fact that the perpetrators wore ski masks and pantyhose was evidence that there was no plan to kill the victims, because otherwise masking would have been unnecessary.  This is unpersuasive.  Appellant ignores other obvious and more likely reasons for the mask wearing, e.g., to avoid being filmed on the Loomis security cameras if the VCR could not be located, to avoid being seen by the victims in case the victims escaped, or to avoid being seen by others while the perpetrators themselves escaped.

Appellant also argues that the evidence suggesting he "arranged for the robbery to take place at a time when few employees would be present" was an indication of his attempt "to minimize the risk to Loomis employees."  This argument is unsupported by any citations to evidence (*Opdyk v. California Horse Racing Board* (1995) 34 Cal.App.4th 1826, 1830), and our review of the record reveals no evidence supporting this assertion.  Rather, the evidence shows that the time of the robbery coincided with the time that shuttle trucks carrying millions of dollars would arrive at the Loomis facility.  Moreover, Livingston's warning to Denise B. not to work late because "the brothers didn't care" about the danger to Loomis employees provides additional evidence countering appellant's argument.

Next, appellant appears to contend that our review of the matter may not take into account evidence that the trial court did not mention when it issued its ruling. Not so. The appropriate standard of review requires that we look at the entire record for substantial evidence and consider the totality of the circumstances. (*People v. Maciel*, *supra*, 57 Cal.4th at pp. 514–515; *Scoggins*, *supra*, 9 Cal.5th at p. 677.) Having undertaken that review, we conclude substantial evidence supports the trial court's conclusion, beyond a reasonable doubt, that appellant was a major participant who acted with reckless indifference to human life.

Finally, appellant argues the trial court must have applied an incorrect standard that was "less demanding" than required by *Banks* and *Clark* because, in his view, substantial evidence does not support the trial court's decision. Having concluded that substantial evidence supports the court's decision, we reject this contention.

## C. Counts 2 and 3

Turning to counts 2 and 3, appellant argues the trial court erred in determining that the jury's lying-in-wait special circumstance finding rendered appellant ineligible for relief under section 1170.95 because that conclusion was "not supported by substantial evidence and is contrary to the law." This is so, he posits, because, in essence, the combination of various instructions might have misled the jurors into believing they could find the lying-in-wait special circumstance true if they found that appellant's accomplices, rather than appellant personally, intentionally killed the victims by lying in wait.

Setting aside the People's procedural argument that appellant must raise this claim via habeas corpus,[9] and assuming arguendo that the trial court erred in determining the jury's lying-in-wait special circumstance finding rendered appellant categorically ineligible for relief under section 1170.95, the perceived error was harmless under any standard.

In terms of harm, appellant contends that, but for the trial court's error, he would have been entitled under section 1170.95 to an order to show cause and hearing, at which point he would have had the opportunity to present new or additional evidence to support his eligibility for relief on counts 2 and 3 and the prosecution would have had the burden of proving his ineligibility beyond a reasonable doubt. Even so, we are not persuaded there is a reasonable probability or possibility that the outcome of any such evidentiary hearing would be different.

Despite its decision regarding counts 2 and 3, the trial court issued an order to show cause and held a hearing with regard to count 1, and neither side presented any new evidence. As already discussed, substantial evidence supports the court's post-hearing determination, beyond a reasonable doubt, that appellant was a major participant in the underlying robbery who acted with reckless indifference to human life. Because the same robbery served as a basis for all three felony murder counts, there is no reasonable probability or possibility that, had counts 2 and 3 proceeded to a hearing along with count 1, the trial court's decision would have been different. In short, no prejudice appears.

---

[9]     The People argue, not only that the instructions were adequate, but also that appellant's attempt to attack the jury's true finding by arguing about instructional error is not appropriately raised here, and it should be raised via habeas corpus. We express no opinion on these arguments as we resolve the issue on other grounds.

**DISPOSITION**

The order denying appellant's section 1170.95 petition is affirmed.

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P.J.

_____
Rodríguez, J.

*People v. Muhammad* (A161877)

33